**In re the DEPARTMENT OF ENERGY STRIPPER WELL EXEMPTION LITIGATION.**

**MOBIL OIL CORPORATION, et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF ENERGY, et al., Defendants.**

M.D.L. No. 378.
Civ. A. No. 78–1070.

United States District Court,
D. Kansas.

Aug. 7, 1990.

See also 739 F.Supp. 1449.

## MEMORANDUM AND ORDER

THEIS, District Judge.

This matter is before the court on cross motions for summary judgment filed by plaintiff/third party plaintiff Mobil Oil Corporation (Doc. 1716) and third party defendant Sun Company, Inc. (Doc. 1777). The court does not believe oral argument would be of material assistance in deciding these motions and therefore denies the requests for argument.

Following the filing of a counterclaim against it by the United States on behalf of the Department of Energy (DOE), plaintiff Mobil Oil Corporation (Mobil) filed an answer and third party complaint against, among others, Sun Company, Inc. (Sun). Mobil alleges that it is a New York corporation with its principal place of business in New York and that Sun is a Pennsylvania corporation with its principal place of business in Pennsylvania. Doc. 1493 ¶¶ 9, 14. Mobil alleges subject matter jurisdiction based on diversity of citizenship, 28 U.S.C. § 1332. Doc. 1493 ¶ 6. The court notes that Sun has made no objection to subject matter jurisdiction, personal jurisdiction, or venue.

Mobil's third party complaint alleges that Sun was a working interest owner and purchaser of crude oil from Mobil-operated properties located in Oklahoma, that Sun assumed responsibility for severance tax payments on the incremental value of stripper well oil that Sun purchased from those Mobil-operated properties, and that Sun withheld or failed to timely deposit into the M.D.L. 378 escrow sums attributable to the incremental value of the stripper well oil, including funds paid to the State of Oklahoma as severance taxes. Doc. 1493 ¶¶ 50–53. Mobil prayed for a judgment that Sun was liable to it for any deposits of principal or interest to the M.D.L. 378 escrow which it was required to make on Sun's account.

The court has previously granted the DOE's motion for summary judgment and ordered that judgment be entered against Mobil in an amount in excess of $10,000,000. The court recently denied Mobil's motion for reconsideration. Mobil asserts in its motion for summary judgment against Sun that $777,105 of the $10,000,000 judgment was attributable to Sun for interest on delayed payments of severance tax amounts into the escrow and interest on delayed payments of principal (i.e., the stripper price increment) into the escrow. *See* Mobil's Reply Brief, Doc. 1790. Mobil's claims against Sun are based on two Mobil-operated properties, known as Putnam Oswego and Thomas Long.[1]

The court is familiar with the standards governing the consideration of a motion for summary judgment. The Federal Rules of Civil Procedure provide that summary judgment is appropriate when the documentary evidence filed with the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The burden at the summary judgment stage is similar to the burden of proof at trial. The court must enter summary judgment "against a party who fails to make a

---

1. Mobil is no longer pursuing some of its initial claims arising out of two other properties. Regarding the Mose Wiley property, Mobil has withdrawn its claim that Sun is liable for deficiencies for the period June 1978 through June 1979. No documentation has been presented for the period after June 1979. Consequently, summary judgment is not appropriate on any issue arising from production from the Mose Wiley property after June 1979. Mobil has withdrawn its claim based on the North Alma Deese property. *See* Doc. 1790.

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact on its claim(s). Rule 56, however, imposes no requirement on the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323, 106 S.Ct. at 2552 (emphasis in original). Once the moving party has properly supported its motion for summary judgment, the nonmoving party may not rest upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial, relying upon the types of evidentiary materials contemplated by Rule 56. Fed.R. Civ.P. 56(e). Each party must demonstrate to the court the existence of contested facts on each claim it will have to prove at trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The court reviews the evidence on summary judgment under the substantive law and based on the evidentiary burden the party will face at trial on the particular claim. *Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513.

For the purposes of the cross motions for summary judgment, the following facts are uncontroverted.

1. In December 1976 the first suit challenging the validity of Ruling 1974–29 was filed in this court by another plaintiff and styled *Braden–Zenith, Inc. v. Federal Energy Administration.*

2. That initial case was consolidated with *Energy Reserves Group v. Federal Energy Administration* for briefing on motions for preliminary injunctions.

3. On June 16, 1977, the court granted the plaintiffs' request for preliminary injunction, enjoining the FEA (now the DOE) from enforcing Ruling 1974–29 against the plaintiffs.

4. The *Energy Reserves* injunction provided that:
IT IS FURTHER ORDERED that, the plaintiffs shall pay or cause to be paid, to the Clerk of the United States District Court for the District of Kansas, at Wichita, Kansas, the difference between the price received for crude oil sold pursuant to any and all certifications of a property as a stripper well property and the price for which such crude oil would have been sold had the same been sold pursuant to a certification of the property as a non-stripper property.

5. Mobil filed this lawsuit on February 4, 1978.

6. On March 23, 1978, the DOE's Office of Enforcement issued a notice of intent to continue enforcement of Ruling 1974–29 pending final judicial resolution of the *Energy Reserves* cases on appeal, except against companies specifically protected by an injunction.

7. On September 6, 1978, the court issued an injunction in favor of Mobil.

8. By letter dated September 12, 1978, Mobil advised Sun that production from the Thomas Long and Putnam Oswego properties had been certified as stripper by the inclusion of injection wells in the well count and was subject to an injunction.

9. Mobil's injunction required Mobil to: pay, or cause to be paid, to the Clerk of the United States District Court for the District of Kansas, at Wichita, Kansas, the difference between the price received for crude oil pursuant to any and all certifications of a property as a stripper well property and the price for which such crude oil would have been sold had the same been sold pursuant to a certification of the property as a non-stripper property.

10. Pursuant to the terms of division orders between Sun as purchaser and the interest owners, including Mobil, as sellers, Sun remitted to the State of Oklahoma all severance taxes on Sun's purchases of crude oil from the Thomas Long and Putnam Oswego properties.

11. Sun remitted severance taxes directly to Oklahoma on the incremental stripper value of its purchases from Mobil-operated properties.

12. Mobil did not instruct Sun to stop remitting the incremental severance taxes to the State of Oklahoma on sales from

Mobil-operated properties subject to the court's injunction.

13. None of the other interest owners from whom Sun was purchasing crude oil from Mobil-operated properties subject to the court's injunction instructed Sun to stop remitting the incremental severance taxes to the State of Oklahoma.

14. In remitting severance taxes to the State of Oklahoma on incremental stripper well values, Sun followed the procedure prescribed by Oklahoma law to indicate that the taxes might be subject to refund once the validity of Ruling 1974–29 had been determined.

15. By letter dated June 8, 1979, the Oklahoma Tax Commission advised Sun and other producers, including Mobil and those from whom Sun purchased oil at Mobil-operated properties, that they did not have to pay gross production (severance) taxes on the stripper price increments being placed in the court's escrow. Rather, the producers and purchasers could report the incremental values to the Commission. If the producers were successful, they could then forward the taxes due plus interest at the higher of 12% per annum or the rate earned in the escrow account.

16. Neither Mobil nor any other interest owner at Mobil-operated properties subject to the court's injunction instructed Sun to stop remitting severance taxes to the State of Oklahoma.

17. Mobil chose not to defer payment of taxes pending the outcome of this litigation.

18. On May 4, 1983, Sun requested a tax refund from the Oklahoma Tax Commission.

19. On October 6, 1983, Sun received a refund from the Oklahoma Tax Commission for gross production tax in the form of vouchers in the amount of $2,630,639.28 and accrued interest of $1,295,532.95, and for petroleum excise tax in the form of credit memos in the amount of $31,859.58.

20. On October 20, 1983, Sun wired the refund into the court's escrow account.

21. Sun made payments of the stripper price increments directly to the M.D.L. 378 escrow on behalf of the interest owners from whom it was purchasing at the Putnam Oswego Unit, net of Oklahoma severance taxes. Because Sun delayed making its first escrow payment for this property until it had received its own injunction and then it paid principal only, an interest deficiency resulted for which Mobil has been held liable. This interest deficiency, computed at the DOE policy rates, amounts to $450,105 as of November 30, 1989.

22. Sun made deposits to the escrow through Mobil for purchases from other Mobil-operated M.D.L. 378 properties.

23. On February 23, 1983, the court issued an order that provided: "plaintiffs shall not make any refunds without court order, pending resolution of the appropriate disposition of the refunds." Doc. 285.

24. A Final Settlement Agreement was approved by the court on July 7, 1986, resolving the issue of the distribution of the escrowed overcharge funds.

25. On November 21, 1988, Mobil filed a third party claim against Sun seeking restitution and contribution of any principal or interest payment required to be made by Mobil to the M.D.L. 378 escrow on Sun's account.

26. On August 25, 1989, the court granted summary judgment in favor of the DOE against Mobil in the amount of $10,-214,510, plus interest accruing after March 31, 1989, through the date of payment.

In its cross motion for summary judgment, Sun has admitted liability for certain late payments of principal amounts into the escrow and has offered to make the escrow whole once the correct amounts and rate of interest are determined. Sun has also admitted liability to Mobil for any liability imposed on Mobil attributable to interest due the escrow based on severance taxes paid to the State of Oklahoma on crude oil Sun owned and sold from the Putnam Oswego property (i.e., attributable to Sun's 5.3% working interest) if the court rules that the DOE policy rates of interest apply.

The court has previously determined, in the order granting the DOE's motion for summary judgment (722 F.Supp. 649 (D.Kan.1989)), that the DOE policy rates of

interest shall apply to overcharge liability in this case. In its brief, Sun urges the court to grant Mobil's motion for reconsideration on the issue of interest rates. Since the filing of Sun's brief, the court has denied Mobil's motion for reconsideration. *See* 739 F.Supp. 1446 (D.Kan.1990). Sun makes no substantive argument on the appropriate rate of interest and the court is not inclined to reconsider its recent order on the issue. Accordingly, the court shall continue to apply the DOE policy rates of interest.

Applying the DOE policy rates of interest, Sun has conceded liability in the following amounts, computed as of November 30, 1989: $450,105 for the Putnam Oswego property and $48,239 for the Thomas Long property for Sun's delayed payment of principal into the court's escrow; and $25,029 for Sun's share of Mobil's liability for interest on severance taxes paid to the State of Oklahoma, based on Sun's 5.3% working interest in the Putnam Oswego Unit. *See* Sun's Reply Brief, Doc. 1796 at 2 & n. 3, 10 n. 12. Based on Sun's admission of liability, summary judgment is appropriate to this extent, with additional interest at DOE policy rates from November 30, 1989.

During the course of the briefing on these motions, several issues initially presented for decision have been eliminated. Consequently, only one issue remains for decision: whether Sun, who as first purchaser of crude oil from Mobil-operated properties remitted severance taxes to the State of Oklahoma, is liable for any portion of the liability imposed on Mobil for additional interest on the severance taxes remitted to Oklahoma which this court ruled (in the opinion granting DOE's motion for summary judgment against Mobil, 722 F.Supp. 649 (D.Kan.1989)) were owing to the M.D.L. 378 escrow. Because the court answers this question in the negative, Mobil's motion for summary judgment shall be denied except to the extent Sun has admitted liability; Sun's motion for summary judgment shall be granted.

Mobil's motion for summary judgment identifies five potential grounds for Sun's liability: (1) the court's injunctions; (2) federal common law and state law of contribu-

tion and indemnity; (3) the court's equitable powers to order restitution; (4) the Final Settlement Agreement; and (5) contractual rights to contribution and indemnity under the Unitization Plans. The court will address each of these arguments, although in a different order.

■ The September 6, 1978 injunction ordered Mobil to "pay, or cause to be paid" the stripper price increment into the court's escrow. Mobil argues that it was thus expressly "empowered" to collect the entire stripper price differential, including amounts attributable to severance taxes, for payment into the escrow. Assuming that Mobil was so empowered, the uncontroverted facts indicate that Mobil chose not to exercise that power. Mobil and the other interest owners at the Mobil-operated properties chose to have Sun, as first purchaser, continue to pay severance taxes to the State of Oklahoma rather than pay those sums into the court's escrow.

Mobil argues that an order entered by the court on February 23, 1983 expressly modified all injunctions and imposes liability on Sun. The February 23, 1983 order provides in relevant part:

> Defendant's motion to preserve the status quo was granted and plaintiffs shall not make any refunds without court order, pending resolution of the appropriate disposition of the refunds.

*Doc. 285.* The court believes that Sun complied with this order by paying the entire amount of the tax refunds it received from Oklahoma into the court's escrow rather than keeping the tax refund in partial refund for the overcharges it paid on the crude oil it purchased from Mobil-operated properties.

■ Mobil also argues that Sun is liable under the Final Settlement Agreement. Sun does not dispute that, as a signatory to the Final Settlement Agreement (FSA), Sun is bound by it. The FSA provides that:

> all Parties are bound by the terms of this Agreement and agree to be bound by an order of the District Court approving and enforcing the Agreement.

FSA ¶ II.A.1. The FSA further provides that "any Party may enforce this Agreement against any other Party ..." FSA

¶ VI.B. Mobil does not identify any substantive rights to be enforced against Sun, since no such substantive rights are contained in the FSA. The FSA does not impose monetary liability on any party to M.D.L. 378:

> Nothing in this Agreement may be read to enlarge, abridge, limit or otherwise affect the ability of the parties to M.D.L. 378 to litigate the issues remaining in M.D.L. 378 concerning the determination and collection of the amount of remaining liability, if any, of any party to M.D.L. 378 for counting injection wells to qualify a property as a stripper well property, ...

FSA ¶ II.A.6. Nothing in the FSA can be read to impose liability to the escrow on Sun. *See also* 739 F.Supp. 1449, 1455 (D.Kan.1990) (granting Oklahoma's motion to dismiss; FSA does not resolve the issue of what funds are owing to the escrow or from whom; no provision in the FSA to enforce against Oklahoma).

■ Mobil also argues that Sun is liable under the Unitization Plan on the Putnam Oswego Unit. The Unitization Plan (Doc. 1717, Exh. E1) makes each working interest owner, including Sun, liable for the payment of severance taxes on its share of production. Mobil also argues that the Unit Plan requires Sun to reimburse Mobil for its share of unit expense. Sun has offered to assume responsibility for the escrow deficiency attributable to the severance taxes and accrued interest from its share (5.3%) of production. Mobil is entitled to nothing more under the Unitization Plan.

Mobil's final argument is that Sun is liable under federal common law of contribution, indemnity, or restitution. *See Exxon Corporation v. Jarvis Christian College*, No. TY–80–432–CA (E.D.Tex. Aug. 25, 1989) (recognizing a federal common law action for reimbursement from royalty and working interest owners after the imposition of sole liability on Exxon, as operator, for overcharges in *United States v. Exxon Corp.*, 561 F.Supp. 816 (D.D.C. 1983), *aff'd* 773 F.2d 1240 (Temp.Emer.Ct. App.1985), *cert. denied*, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986)).

■ The United States Supreme Court has long held that there is "no federal general common law." *Erie Railroad v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). However, in certain limited areas, the federal courts have authority to formulate federal common law. *See Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981). These instances fall into two general categories: "those in which a federal rule of decision is 'necessary to protect uniquely federal interests,' and those in which Congress has given the courts the power to develop substantive law ..." *Id.* (citations omitted). Absent congressional authorization for the courts to formulate substantive rules of decision,

> federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases. In these instances, our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the interstate or international nature of the controversy makes it inappropriate for state law to control.

*Id.* at 641, 101 S.Ct. at 2067 (footnotes omitted). This case implicates a uniquely federal interest, federal petroleum price controls, which requires the application of federal common law.

■ To determine whether a federal common law cause of action should be recognized, the court must begin with a brief discussion of the operator liability doctrine. Under the operator liability doctrine, the DOE may hold the operator of a crude oil producing property liable for the entire amount of overcharges which occurred, even though the operator may have received only a portion of the overcharges corresponding to its percentage ownership interest in the property. Operator liability has been imposed in at least two general situations: when the operator is the an-

imating force responsible for the overcharges, or when the operator is held liable as a matter of administrative convenience. *See Sauder v. Department of Energy*, 648 F.2d 1341, 1347–48 (Temp.Emer.Ct.App. 1981) (sole operator certified the leases as stripper well leases and caused the overcharges); *United States v. Exxon Corp.*, 561 F.Supp. 816, 850 (D.D.C.1983), *aff'd* 773 F.2d 1240, 1270 (Temp.Emer.Ct.App.1985), *cert. denied*, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986) (requiring DOE to proceed against over 200 working interest owners and over 2200 royalty interest owners would plunge DOE into an "administrative quagmire").

 The courts have stated, however, that the operator "is not without recourse against the other interest owners, ..." *Exxon*, 561 F.Supp. at 850. The burden of pursuing each individual owner is placed upon the operator. *Sauder*, 648 F.2d at 1348. During the overcharge proceedings, the court does not determine the nature or extent of the operator's right to contribution or indemnity, if any. Nor does the court adjudicate the rights or liabilities of absent interest owners. *Exxon*, 773 F.2d at 1271. Imposition of sole liability on the operator does not depend on a finding that the operator is entitled to contribution for the overcharges from the other working interest and royalty interest owners in the property. *Id.* at 1272.

*Exxon Corporation v. Jarvis Christian College*, No. TY–80–432–CA (E.D.Tex. Aug. 25, 1989) is the only case of which this court is aware involving the alleged liability of interest owners to the operator who paid the entire amount of the overcharges. In finding a federal common law cause of action, Judge Robert M. Parker found that reimbursement implicated a uniquely federal interest. Exxon had been held liable for violating the two-tier pricing regulations under the Economic Stabilization Act and the Emergency Petroleum Allocation Act. That two-tier pricing structure was designed to combat inflation and

encourage domestic production of crude oil. *Id.* at 5. If other interest owners had received and retained the overcharges, the interest owners would undermine those two goals. *Id.* at 6. Had the other interest owners been a party to the overcharge proceedings in *United States v. Exxon*, the district court could have required restitution from them. The DOE, however, chose not to pursue the other interest owners because of the administrative burden. *Id.* For these reasons as well as a sense of justice and fairness, the court held that Exxon had an implied cause of action under federal common law for reimbursement. *Id.* at 6–7.[2]

 Following imposition of sole liability on the operator, the operator has the burden of pursuing each individual working interest and royalty interest owner to recover the overcharges which that interest owner received. The cause of action recognized in *Jarvis* involves the potential liability of the interest owners. In the present action, Mobil is seeking to extend liability to an entity that is not an interest owner. Mobil is not seeking to impose liability on Sun for Sun's share of the escrow deficiencies as a 5.3% working interest owner on the Putnam Oswego Unit. Mobil is seeking to hold Sun liable for all of the deficiencies because Sun as the first purchaser of the crude oil made the severance tax payments to the State of Oklahoma. The court does not believe liability should be extended to the first purchaser in this instance. Holding an interest owner liable for its share of the overcharges is fair because the owner received its share of the overcharges. As between the operator of the property and the first purchaser, neither of whom received or retained all the overcharges, it is fairer to impose liability on the operator who has a potential cause of action against the working interest and royalty interest owners.

IT IS BY THE COURT THEREFORE ORDERED that Mobil's motion for summa-

**2.** Whether the working interest and royalty interest owners are liable to Exxon for the Hawkins Field Unit overcharges paid by Exxon pursuant to *United States v. Exxon Corp.* remains to be determined. *Exxon Corp. v. Jarvis Christian College*, No. TY–80–432–CA (E.D.Tex.) is currently pending in the United States District Court for the Eastern District of Texas. This court is unaware of any final disposition in this matter.

ry judgment (Doc. 1716) is hereby granted in part and denied in part.

IT IS FURTHER ORDERED that Sun's motion for summary judgment (Doc. 1777) is hereby granted.